UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GAYLE ANN FOX,

Plaintiff,

v.

COMMISSIONER OF SOCIAL SECURITY,

Defendant.
_______________________________/

Civil Action No. 17-10326

HON. MARIANNE O. BATTANI
U.S. DISTRICT JUDGE
HON. R. STEVEN WHALEN
U.S. MAGISTRATE JUDGE

**REPORT AND RECOMMENDATION**

Plaintiff Gayle Ann Fox ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), challenging a final decision of Defendant Commissioner denying her application for Disability Insurance Benefits and Supplemental Security Income under the Social Security Act. Both parties have filed summary judgment motions which have been referred for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). For the reasons set forth below, I recommend that Defendant's motion for summary judgment [Docket #20] be GRANTED and that Plaintiff's motion for summary judgment [Docket #16] be DENIED.

## I. PROCEDURAL HISTORY

On March 24, 2014, Plaintiff filed an applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"), alleging disability as of April 23, 2013 (Tr. 175, 182). After the initial denial of the claim, she requested an administrative hearing, held on October 28, 2015 before Administrative Law Judge ("ALJ") John Dodson (Tr. 33). Plaintiff, represented by counsel, testified (Tr. 37-51), as did Vocational Expert ("VE") Michele Robb (Tr. 51-57). On December 23, 2015, ALJ Dodson found that Plaintiff was not disabled (Tr. 19-28). On December 9, 2016, the Appeals Council denied review (Tr. 1-3). Plaintiff filed for judicial review of the Commissioner's decision on February 1, 2017.

## II. BACKGROUND FACTS

Plaintiff, born January 28, 1970, was 45 when the ALJ issued his decision (Tr. 28, 175). She completed high school and received training in medical billing and administration (Tr. 233). She worked previously as an auditor in the automotive industry and in data entry for a bank (Tr. 233). Her application for benefits alleges disability as a result of depression, anxiety, spinal stenosis, degenerative disc disease, arthritis of the knees, back pain, and hypertension (Tr. 232).

### A. Plaintiff's Testimony

Plaintiff offered the following testimony:

After completing high school, she worked at a bank doing imaging, data entry, and customer service (Tr. 37). She completed orientation training at the bank but did not receive further job training (Tr. 37). She stopped working at the bank in 2010 and later worked at

General Motors ("GM") in 2012 and 2013 (Tr. 38). GM put her "on leave" in 2013 after she lost four family members in a short period of time and "wasn't ready to come back to work" (Tr. 38). She had received treatment from a doctor for her emotional issues until she lost her medical coverage (Tr. 38). At the time of the hearing, her treatment was limited to seeing her family doctor (Tr. 38).

Since her mother died two years before the hearing, Plaintiff had "no desire to do anything" (Tr. 38). Due to the lack of medical insurance, she had not seen a psychiatrist since 2014, but now that she had state medical coverage, she planned to seek treatment through Easter Seals (Tr. 39). In addition to the symptoms of depression, she experienced anxiety characterized by nervousness (Tr. 40). She experienced two to three episodes of anxiety each week for which she took Xanax (Tr. (Tr. 40). She had also experienced back, hip, and knee pain for the past three to five years (Tr. 40). She underwent gastric bypass surgery resulting in the loss of over 200 pounds (Tr. 40). Despite the surgery, she continued to experience pain (Tr. 40). She experienced the medication side effect of drowsiness (Tr. 42).

Plaintiff was divorced in 2013 after 22 years of marriage (Tr. 41). She lived with her niece in a condominium (tr. 42). She did not help her niece with home care (Tr. 42). On a typical day, she awoke at around 2:00 a.m., watched television for up to six hours, moved from the bed to a chair then to a recliner for up to six hours (Tr. 42). Due to medication side effects she fell asleep "wherever" she was (Tr. 42). She was unable to dress herself on most days and generally, only got dressed (with the help of her niece) when she going to a

doctor's appointment (Tr. 43). She was unable to walk for more than 15 minutes at a time due to back and knee problems (Tr. 44). She also experienced hand problems (Tr. 44-45). She did not attend church or shop and did not leave the house more than once or twice a month (Tr. 45). She was unable to work due to body pain and the side effect of drowsiness (Tr. 45). Physical therapy had not improved her condition (Tr. 46). Her physical problems were the primary reason she was unable to work but her emotional problems were also work preclusive (Tr. 46-47). She spent around two hours every day crying (Tr. 47).

Her work at GM consisted of pushing carts weighing about 360 pounds and exchanging empty baskets for full baskets for other workers (Tr. 48). Her past work also included sit-down work at a "little button factory" (Tr. 48). She would be unable to perform even the button factory job or any of her former positions due to her inability to concentrate (Tr. 48). During her stint at the bank, she spent six months in customer service but would be unable to perform that position due to her inability to sit for long periods (Tr. 50). Plaintiff was able to drive for short distances (Tr. 51).

**B. Medical Evidence**

**1. Evidence Related to Plaintiff's Treatment**

In March, 2013, Corey Haber, D.O. noted a diagnosis of fibromyalgia, sinusitis, and depression (stable) (Tr. 334-335). The following month, Dr. Haber noted that Plaintiff was "happier" and "more energetic" after changing psychotropic medication (Tr. 337). In May, 2013, Dr. Haber diagnosed her with "situational anxiety" (Tr. 344). Psychological intake records from May, 2013 note Plaintiff's report of depression and anxiety due to the "life

stressors" of divorce and her mother's recent death (Tr. 285). Plaintiff reported that she took Paxil for panic attacks and Xanax for anxiety (Tr. 286). She lived in a mobile home community close to several siblings (Tr. 286). Olga Slavin-Penny, Ph.D. found that Plaintiff "could benefit from a course of cognitive-behavioral therapy," antidepressive medication, and "gradually tapering off of Xanax" (Tr. 287). Counseling records from the next month note "dysphoric mood" as a result of Plaintiff's separation from her husband but that she was "motivated for treatment" and "compliant with recommendations" (Tr. 291). Plaintiff reported that she had moved into her mother's house, walked the dog in the mornings, and felt "ready to go back to work" the following month (Tr. 293-295).

The same month, Plaintiff sought information regarding an abdominal lipectomy (Tr. 297). She exhibited good hygiene and grooming (Tr. 297). A physical examination was unremarkable except for morbid obesity (Tr. 297). August, 2013 records by psychiatrist Bryan Weinstein, D.O. note a depressed mood with a constricted affect (Tr. 316, 402). Plaintiff appeared "logical" and "appropriate" with intact concentration and judgment (Tr. 316).

A September, 2013 CT of the upper extremity showed bilateral moderate osteoarthrosis of the sternoclavicular joint (Tr. 300-301). A chest x-ray was unremarkable (Tr. 375). The same month, Plaintiff underwent a vaginal hysterectomy without complications (Tr. 359). A November, 2013 x-ray of the lumbar spine showed minimal rotoscoliosis and moderate spondylosis at L1-L2 (Tr. 312). The same month, Dr. Weinstein found that Plaintiff was unable to work until January, 2014 (Tr. 393). An MRI from the

following month showed moderate neural foramen narrowing at L4-L5 with nerve root effacement and a disc herniation at L5-S1 (Tr. 314). Dr. Haber noted lumbar tenderness with spasms but no neurological or lower extremity symptoms (Tr. 365-366). He noted that Plaintiff was improperly receiving controlled substances from two providers (Tr. 366). The following month, Dr. Weinstein found that Plaintiff was capable of returning to work as of December 5, 2013 (Tr. 328). The same month, Dr. Haber noted non-radiating back pain (Tr. 369). The following month, Dr. Weinstein found that Plaintiff was unable to work for the next two months (Tr. 329).

Dr. Haber's February, 2014 records note Plaintiff's report of "severe knee and lower back pain" (Tr. 370). Plaintiff stated that she did not want back surgery or additional steroid injections (Tr. 371-372). She exhibited a normal mood and affect (Tr. 372). Plaintiff reported the use of medical marijuana for a "multitude of symptoms" (Tr. 370). In March, 2014, Dr. Weinstein again found that Plaintiff was unable to work for the next two months (Tr. 321). In April, 2014, Plaintiff was re-prescribed Neurontin, Wellbutrin, and Xanax (Tr. 319). Dr. Haber noted a normal mood and affect (Tr. 373, 454). The same month, Dr. Weinstein noted that Plaintiff exhibited sadness, poor concentration, and low motivation and initiation (Tr. 379). He noted that Plaintiff was "grieving" her divorce and loss of employment (Tr. 381). He noted intact concentration and appropriate thought content (Tr. 381). In June, 2014, Dr. Haber noted that the condition of depression was stable (Tr. 452). He noted that Plaintiff was "going for disability and still can't work at least until August 1" (Tr. 452). He noted Plaintiff's report of back pain but remarked on the absence of

neurological symptoms (Tr. 451). His records from the following month note that Plaintiff was currently in a relationship (Tr. 449). Plaintiff expressed an interest in removing an excess skin which occurred as a result of bariatric surgery (Tr. 446). She reported that she was unable to go back to work due to leg and back pain and psychological symptoms (Tr. 442). In September, 2014, Kenneth J. Richter, D.O. examined Plaintiff, finding that "she has to get up and get moving" (Tr. 461). He also recommended continued psychiatric treatment (Tr. 461). November, 2014 imaging studies showed mild degenerative changes of the right hip and minimal changes of the left hip (Tr. 474-475).

A February, 2015 CT of the head ordered in response to Plaintiff's report of headaches was unremarkable (Tr. 432, 463). The following month, Plaintiff denied back pain (Tr. 428). She exhibited a normal gait (Tr. 498). An examination of the cervical, thoracic, and lumbar spine was unremarkable (Tr. 498). April, 2015 imaging studies showed mild degenerative changes of the bilateral knees and hips (Tr 276, 480-483, 515). Plaintiff described the back and knee pain as "moderate" (Tr. 505). Dr. Corey noted a good range of knee motion (Tr. 419). A May, 2015 chest x-ray was unremarkable (Tr. 456). A June, 2015 x-ray of the right foot was positive for bone spurs (Tr. 484). In August, 2015, Dr. Haber noted a good mood and normal affect (Tr. 422). Plaintiff reported that she was "doing fine" (Tr. 421).

**2. Non-Treating Sources**

In June, 2014, Craig Brown, Ed.D. performed a consultative psychological examination on behalf of the SSA, noting Plaintiff's report that she had moved to Jackson,

Michigan to live with her boyfriend (Tr. 405). Dr. Brown noted that Plaintiff was tearful but denied a suicidal plan (Tr. 405-406). She reported good results from Xanax (Tr. 406). She reported that she had been receiving psychiatric counseling until moving to Jackson seven weeks earlier (Tr. 407). She reported that she went shopping with her boyfriend occasionally but denied other outside activities (Tr. 408). Plaintiff, 234 pounds, reported that she had lost over 200 pounds following 2010 gastric bypass surgery (Tr. 409). She exhibited a normal gait in the office and parking lot but reported that some days she had difficulty getting out of bed because of pain (Tr. 409). She exhibited normal manners and attentiveness (Tr. 409-410). Dr. Brown found that Plaintiff was able to handle her own finances and had a "fair" prognosis with treatment (Tr. 415).

The same month, Michael Parish, M.D. performed a non-examining assessment of the treating and consultative records related to Plaintiff's physical condition, finding that she could lift 20 pounds occasionally and 10 frequently; sit, stand, or walk for six hours in an eight-hour workday; and push and pull without limitation (Tr. 71). Dr. Parish found that Plaintiff could climb stairs/ramps, balance, stoop, kneel, crouch, and crawl on an occasional basis but was precluded from all climbing of ladder, ropes, or scaffolds (Tr. 71-72). He declined to find additional limitations (Tr. 72).

The following month, Dyan Hampton-Aitch, Ph.D. performed a non-examining assessment of the records pertaining to Plaintiff's psychological condition on behalf of the SSA, finding that the presence of mild limitation in activities of daily living and moderate limitation in social functioning and concentration, persistence, or pace (Tr. 69-70).

**C. Vocational Expert Testimony**

VE Robb classified Plaintiff's former work as an office clerk as semiskilled and exertionally light and work as a material handler, semiskilled/heavy[1] (Tr. 51). The ALJ then described an individual of Plaintiff's age, education and work experience:

> This person would be limited to light work. There could be no ropes, ladders, or scaffolds. Only occasional [for] remaining postural [activity]. This would be unskilled work involving one to three step repetitive tasks. This would be work not involving the public. Only occasional interaction between coworkers and supervisors. Also, there can be no concentrated exposure to hazards such as heights and machinery. Would such a person be able to do any of [Plaintiff's] prior relevant work? (Tr. 54).

Citing the *Dictionary of Occupational Titles* ("*DOT*"), the VE responded that given the above limitations, the individual would be unable to perform Plaintiff's past relevant work but could perform the unskilled jobs of hand packer (approximately 98,000 positions in the national economy); inspector (60,000); and bench assembler (148,000) (Tr. 52). The VE testified that if the hypothetical individual were further limited by the need to change from a sitting to standing position four times an hour, the hand packer job numbers would be reduced by 50 percent; and inspector and bench assembler numbers would be reduced by 25

---

1

20 C.F.R. § 404.1567(a-d) defines *sedentary* work as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools; *light* work as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds;" *medium* work as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and that exertionally *heavy* work "involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. *Very Heavy* work requires "lifting objects weighing more than 100 pounds at a time with frequent lifting or carrying of objects weighing 50 pounds or more. § 404.1567(e).

percent (Tr. 53). The VE testified that all competitive employment would be precluded if the same individual were off task for more than 20 percent of the workday (Tr. 54).

In response to questioning by Plaintiff's attorney, the VE testified that the need for a sit/stand/walk option allowing the hypothetical individual to walk for 15 minutes each hour "on a predictive schedule" would preclude all work (Tr. 57). The VE stated that her job testimony was consistent with information found in the *DOT*, adding that her testimony regarding the sit/stand option and the need to stay "on task" for at least 85 percent of the workday was based on her own professional experience (Tr. 57).

**D. The ALJ's Decision**

Citing Plaintiff's medical records, ALJ Dodson found the "severe" impairments of "degenerative joint disease of the hips and knees; degenerative changes of the bilateral sternoclavicular joints; degenerative disc disease of the lumbar spine with scoliosis, stenosis, and spondylosis; obesity; depression; and anxiety," but that none of the conditions met or medically equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Tr. 21-22). During the same period, the ALJ found that Plaintiff experienced mild limitation in activities of daily living and moderate limitation in social functioning and concentration, persistence, or pace (Tr. 23). The ALJ found that Plaintiff had the Residual Functional Capacity ("RFC") for light work with the following additional limitations:

> [S]he cannot climb ladders, ropes, or scaffolds. The claimant can occasionally climb ramps and stairs. She can occasionally balance, kneel, stoop, crouch, and crawl. The claimant is limited to unskilled, one to three-step, repetitive tasks. She cannot interact with the public. The claimant can occasionally

> interact with coworkers and supervisors. She must avoid concentrated exposure to hazards such as unprotected heights and dangerous moving machinery (Tr. 24).

Citing the VE's job findings, the ALJ determined that while Plaintiff was unable to perform any of her past relevant work, she could work as a hand packer, inspector, and bench assembler (Tr. 27-28, 52).

The ALJ discounted Plaintiff's alleged degree of physical and mental limitation. He noted that while the imaging studies showed the presence of degenerative changes, clinical testing did not reveal "nerve root" involvement or neurological complications (Tr. 24-25). He noted that Plaintiff's treatment for the physical conditions had been wholly conservative (Tr. 25). As to the mental health conditions, the ALJ observed that Plaintiff "did not appear to be overly sad or anxious and interacted appropriately with her doctor" (Tr. 25). He noted that she was well dressed and "had no difficulty understanding instructions or remembering information" (Tr. 25).

## III. STANDARD OF REVIEW

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence. 42 U.S.C. §405(g); *Sherrill v. Secretary of Health and Human Services,* 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence is more than a scintilla but less that a preponderance. It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of review is deferential and

"presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986)(en banc). In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ. *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

## IV. FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy. 20 C.F.R. §416.920(a). The Plaintiff has the burden of proof at steps one through four, but the burden shifts to the Commissioner at step five to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy."

*Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

## V. ANALYSIS

### Plaintiff's Allegations of Disability[2]

In her first argument, Plaintiff contends that the ALJ over-relied on Dr. Brown's consultative psychological examination conclusions and Plaintiff's short-term ability to take daily walks to support the conclusion that the allegations of physical limitation were not credible. *Plaintiff's Brief* at 5-6, *Docket #16,* Pg. ID 599. In her second argument, she contends that the ALJ gave short shrift to her allegations of disabling psychological problems. *Id.* at 6-7.

The credibility determination, currently guided by SSR 96-7p, describes the process for evaluating symptoms.[3] As a threshold matter, the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment ... that can be shown

---

2

While Plaintiff's first issue heading states that the administrative decision was not supported by substantial evidence, her actual argument pertains to the ALJ's credibility determination. *Plaintiff's Brief,* 5-6, *Docket #16,* Pg ID 599. Because she also disputes the credibility determination in her second argument, *Id.* at 6-7, the two arguments will be considered in tandem.

3

In March, 2016, SSR 16-3p superceded SSR 96-7p. The newer Ruling eliminates the use of the term "credibility" from SSA policy. SSR 16-3p, 2016 WL 1119029, *1 (Mar. 16, 2016). The Ruling states that "subjective symptom evaluation is not an examination of an individual's character." Instead, ALJs are directed to "more closely follow [the] regulatory language regarding symptom evaluation." See 20 C.F.R. § 404.1529(c)(3), fn 7, *below.* Nonetheless, SSR 96-7p applies to the present determination, decided on December 23, 2015. See *Combs v. CSS*, 459 F.3d 640, 642 (6th Cir. 2006)(*accord* 42 U.S.C. § 405(a))(The Social Security Act "does not generally give the SSA the power to promulgate retroactive regulations").

by medically acceptable clinical and laboratory diagnostic techniques." 1996 WL 374186 at *2 (July 2, 1996). The second prong of SSR 96-7p directs that whenever a claimant's allegations regarding "the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence," the testimony must be evaluated "based on a consideration of the entire case record."[4] *Id.*

Plaintiff's claim of either procedural or substantive deficiencies in the ALJ's credibility determination is not well taken. As to the first prong of the determination, the ALJ found workplace limitations as a result of "degenerative joint disease of the hips and knees; degenerative changes of the bilateral sternoclavicular joints; degenerative disc disease of the lumbar spine . . .; obesity; depression; and anxiety" (Tr. 21). Plaintiff does not dispute the Step Two findings or argue that the ALJ omitted other conditions expected to create workplace limitations. My own review of the transcript shows that she did not experience significant limitations other than those found by the ALJ.

---

4

In addition to an analysis of the medical evidence, 20 C.F.R. 404.1529(c)(3) lists the factors to be considered in making a credibility determination:

> "(i) . . . daily activities; (ii) The location, duration, frequency, and intensity of your pain or other symptoms; (iii) Precipitating and aggravating factors; (iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms; (v) treatment, other than medication, you receive or have received for relief of your pain or other symptoms; (vi) Any measures you use or have used to relieve your pain or other symptoms ... and (vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms."

The ALJ analysis of the second prong of the credibility determination is also adequately articulated and supported. As to the allegations of physical limitation, the ALJ acknowledged the imaging studies of the upper extremities showing degenerative changes to the sternoclavicular joints (Tr. 24). He cited imaging studies showing moderate degenerative changes of the hips and knees (Tr. 25). However, he noted that while the imaging studies showed some degree of limitation, she did not exhibit neurological symptoms (Tr. 24-25). He observed that her treatment was exclusively conservative and that as of June, 2013, she was able to walk her dog every morning (Tr. 25, 293-295). The ALJ did not err in finding that the clinical observations, conservative treatment, and Plaintiff's self-reported activities were consistent with Dr. Parish's non-examining conclusion that she could perform a limited range of exertionally light work (Tr. 26, 71-72).

While Plaintiff contends that the ALJ improperly relied on her ability to walk her dog as of June, 2013 to discredit her claims of subsequently worsening physical problems, *Plaintiff's Brief* at 5, the later records also support the RFC for a limited range of light work. Both Dr. Brown's June, 2014 consultative report and the February, 2015 treating records note a normal gait (Tr. 409, 498). Despite Plaintiff's allegations of disabling physical limitation, he ALJ also noted that the later treating records show the absence of neurological symptoms (Tr. 276, 480-483, 515).

The ALJ's conclusions regarding Plaintiff's psychological limitations are likewise well supported. Contrary to Plaintiff's assertion, *Plaintiff's Brief* at 7, the ALJ addressed her testimony that she experienced daily two-hour crying jags (Tr. 25). However, he noted that

after Plaintiff was prescribed psychotropic medication, "she did not appear to be overly sad or anxious and interacted appropriately with her doctor" (Tr. 25). The ALJ accurately noted that the treating and consultative records showed "no difficulty understanding instructions or remembering information" (Tr. 25). As such, the RFC for "unskilled, one to three-step, repetitive tasks" precluding interaction with the public with only occasional interaction with coworkers and supervisors (Tr. 24) reflects the degree of psychological limitation found in the record (Tr. 25). My own review of transcript, showing that Plaintiff possessed the wherewithal to engage in at least one significant relationship and move to a new city during the relevant period also supports the finding that she was capable of unskilled work with at most occasional interaction with others (Tr. 405, 449).

Plaintiff's related argument that the case should be remanded for an updated psychological assessment should also be rejected. *Plaintiff's Brief* at 6. Determination of whether a consultative examination is necessary is within the discretion of the ALJ and appropriate only where the existing record "is insufficient or inconsistent." 20 C.F.R. §§ 404.1520b, 404.1520b(c)(3). The current transcript is neither. While Plaintiff did not receive psychiatric counseling after April, 2014, Dr. Brown's June, 2014 consultative findings are consistent with the ALJ's finding of mild to moderate psychological limitation (Tr. 409-410). Dr. Haber's 2014 and 2015 records by do not suggest that Plaintiff's psychological condition worsened in the next 18 months. August, 2015, records note a good mood and normal affect and that she reported that she was "doing fine" (Tr. 421-422).

Notwithstanding that substantial evidence supports the ALJ's findings, my recommendation to uphold the Commissioner's decision should not be read to trivialize Plaintiff's personal, physical, or psychological challenges. However, because the ALJ's decision was within the "zone of choice" accorded to the fact-finder at the administrative hearing level, it should not be disturbed by this Court. *Mullen v. Bowen, supra*.

## VI. CONCLUSION

For these reasons, I recommend that Defendant's motion for summary judgment [Docket #20] be GRANTED and that Plaintiff's motion for summary judgment [Docket #16] be DENIED.

Any objections to this Report and Recommendation must be filed within 14 days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within 14 days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than 20 pages in length unless by

motion and order such page limit is extended by the court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

s/ R. Steven Whalen
R. STEVEN WHALEN
UNITED STATES MAGISTRATE JUDGE

Dated: December 8, 2017

CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was sent to parties of record on December 8, 2017, electronically and/or by U.S. mail.

s/Carolyn M. Ciesla
Case Manager to the
Honorable R. Steven Whalen